UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cr-20472-MD

UNITED STATES OF AMERICA,

v.

JULIAN FLORES,

 Defendant.

_____/

### REPORT AND RECOMMENDATION ON DEFENDANT'S
### MOTIONS TO SUPPRESS STATEMENTS

This cause is before the Court on Defendant Julian Flores' Motion to Suppress Statements (the "Motion"). [ECF No. 30]. The Motion was referred to the Undersigned by the Honorable Melissa Damian. [ECF No. 33]. The Court has considered Defendant's Motion, the Government's Response [ECF No. 32], Defendant's Reply [ECF No. 35], the parties' arguments at the May 14, 2024, hearing, and all relevant authorities. For the reasons addressed below it is **RECOMMENDED** that the Motion [ECF No. 30] be **DENIED**.

### BACKGROUND

On December 7, 2023, Julian Flores and Lourdes Diaz—Flores' co-defendant and mother—were charged with Conspiracy to Commit Hobbs Act Robbery in violation of 18 U.S.C. § 1951(A), Hobbs Act Robbery in violation of 18 U.S.C. § 1961(A), and Discharge of a Firearm in Furtherance of a Crime of Violence, in violation of 18 § U.S.C. 924(c). [ECF No. 1]. A jury trial is set for July 15, 2024, before Judge Damian. [ECF No. 39].

The charges stem from an investigation of a robbery that took place on September 16, 2023, of an individual who owns a salon and jewelry business. [ECF No. 32 at 2]. According to the

1

Government, the victim left the business carrying a suitcase containing gold jewelry valued at approximately $750,000. [*Id.* at 2–3]. Flores allegedly grabbed the suitcase and, when the victim resisted, whipped her with a revolver multiple times and fired a round towards the ground. [*Id.*]. When she released the suitcase, Flores grabbed it, took it back to his vehicle, and Diaz drove off with Flores in the vehicle. [*Id.* at 3]. After an investigation, law enforcement located Flores and took him into custody on October 2, 2023. [*Id.*].

At issue here are statements made during two post-arrest interviews conducted by Hialeah Police Department detectives at the City of Hialeah Police Station. [ECF No. 30 at 1].[1] The Court will provide the relevant portions of each transcript in chronological order (as was argued at the hearing on the motion to suppress and analyzed by the parties in their briefs), dividing Flores' statements into three groups: First Interview Pre-*Miranda*; First Interview Post-*Miranda*; and Second Interview.

## A. First Interview Pre-*Miranda*

Prior to giving a *Miranda*[2] warning, police detectives asked Flores a series of background questions, including his name, address, cellphone number, education, and employment status, among others. [ECF No. 30-3 1–7]. Although the government does not intend to present Flores' pre-*Miranda* statements at trial [ECF No. 32 at 1], Flores contends the Court should still issue a ruling regarding whether the statements violated his constitutional rights because information

---

[1] The two video recordings of the two interviews are attached to Defendant's Motion at ECF Nos. 30-1 and 30-2. The transcripts for each interview are attached to Defendant's Motion at ECF Nos. 30-3 and 30-4. The parties entered excerpts and clips of these exhibits into evidence at the May 14, 2024, hearing. For clarity's sake, the Court will refer to these exhibits by their respective ECF numbers.
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

solicited regarding his cellphone was used to support a search warrant issued by the State. [ECF No. 30 at 2].

**B.  First Interview Post-*Miranda***

Approximately eleven minutes into the interview, Flores was offered the *Miranda* form and was asked whether he preferred to read it himself or have it read to him. [ECF No. 30-3 at 7]. He chose to have it read to him. [*Id*.]. Detective Azael Acay, Robbery Unit Detective for the City of Hialeah, read Flores his *Miranda* rights:

> Det. Acay: Okay. All right. So I don't know if you know how this works, your Miranda rights, okay? It says you have the right to remain silent. You understand that? It just means if you don't want to talk about the case, then you don't have to talk about it. You understand that, right?
>
> Julian Flores: Right.
>
> Det. Acay: Yes. You got to say yes or no because I can't hear you.
>
> Julian Flores: Yeah, the answer is yes.
>
> Det. Acay: I don't know. Okay. All right. Anything you say can and will be used against you in the court. You understand that?
>
> Julian Flores: Yes.
>
> Det. Acay: Okay. You got the right to talk to an attorney for advice before we ask you any questions and before questioning. Do you understand that?
>
> Julian Flores: Yes.
>
> Det. Acay: Okay. If you cannot afford an attorney, the State will appoint one for you if you desire. You understand that?
>
> Julian Flores: Yes.
>
> Det. Acay: All right. If you decide to answer questions now without an attorney present, you still have the right to stop answering any time or until you talk to a lawyer. You understand that?
>
> Julian Flores: Yes.
>
> Speaker 4: That's important you speak. If at any point you don't want to talk anymore, then it stops here.
>
> Det. Acay: All right. Do me a favor, sign here.
>
> Det. 2: Do you understand your rights?

Det. Acay: Saying that-

Det. 2: This is just customary.

Det. Acay: This is just saying that you understood.

Det. 2: This is our protocol. Obviously, you're here, not voluntary. You're here. We have to talk to you about something and this is-

Det. Acay: This is the only way we could inform you what we have. Okay?

Det. 2: We're good?

Det. Acay: All right.

Det. 2: If you understand and you're willing to talk to us without an attorney and you understand your rights, then you can sign right here, and print your name.

Julian Flores: So wait, repeat the last part again?

Det. 2: That if you understand your rights and you're willing to speak to us regarding why you're here, then sign there. At any point, if you don't want to talk to us...

Det. Acay: You can always, even if you sign it, you can just say, "I don't want to talk anymore."

Det. 2: Nobody's forcing you here. You understand what I'm saying?

Julian Flores: Yeah.

[*Id.* at 8–9].

The detective gave the *Miranda* waiver form to Flores who then signed it. When the detective began to question Flores about the car he was driving, Flores stated he "would like to make the phone call that I know I can make. Bro, I'm out here isolated," although he did not say who he wanted to call. [*Id*. at 13]. Detective Aguero responded that Flores had "nothing to worry about." [*Id.*]. The detective further elaborated that he "should have nothing to worry about. If I'm being questioned, I'm going to tell them exactly what I've done, especially if I haven't done shit. Right?" [*Id.*]. Flores, however, expressed concern that the detectives believed he had "done something" and asked to speak to a lawyer. [*Id.*]. Then, about ten minutes after being read his *Miranda* rights, the following exchange occurred:

> Julian Flores: Yeah. So I would like to contact a lawyer or something. I want to be guided by somebody. There's three people sitting in front of me and it's just me right now, and I'm getting questions by-
>
> Det. Acay: Bro, we're asking you separate questions.
>
> Det. 2: Yeah. That's why you're here.
>
> Det. Acay: We haven't even spoken about any crimes.
>
> Julian Flores: I understand that. I'm not even talking about no crime. I haven't even said anything about a crime. I'm just saying, I'm here. I'm being... Obviously I'm detained. I already got my Miranda Rights read, and again, I don't feel comfortable. I would like to have some guidance-
>
> Det. Acay: You want to know?
>
> Julian Flores: So I would like to get a contact [*sic*] my lawyer or make my phone call by now.

[*Id.* at 14].

The detectives then explained they were investigating the robbery and explained to Flores that he could decide whether he wanted to speak with them. [*Id.*]. The detective stated that the robbery had occurred in Hialeah, the victim was robbed of luggage containing jewelry and was pistol whipped, and that a car was used. Detectives then asked Flores if he recalled where he was on the day of robbery. [*Id.* at 15]. Flores claimed he was spending some time with his girlfriend but also stated:

> [B]ut like I said, now you're saying about robbery, it's getting a little bit more serious. There's some pistol whip involved. It was a little serious now. So again, I would prefer to contact my lawyer and be properly guided because you guys are not pointing it like that. But again, if I'm hearing you guys talking to me about it, it's basically like if I'm being accused of it. So I prefer yes, to have proper guidance or somebody I do feel comfortable.

[*Id.*].

The officers then concluded the interview explaining that they could no longer speak with him because he had requested a lawyer, that he would go to jail, and that the lawyer "will guide you from there." [*Id.*]. At the conclusion of the interview, Flores was told: "[y]ou can't bring your

lawyer here and sit down and have questions." [*Id.* at 16]. Flores stated he understood but wanted

to contact his mother to let her know where he was. [*Id.*].  Flores was then placed in a holding cell.

## C. <u>Second Interview</u>

Approximately four hours later, Flores re-initiated dialogue with Detective Richard

Aguero, Robbery Unit Detective for the City of Hialeah, asking to "cooperate" even though he

understood there would be no attorney present:

> Det. 2: All right. You have a [inaudible 00:00:11] in there. This is the second
> interview with Julian Flores regarding Hialeah Police case number 202326222. My
> name's detective [inaudible 00:00:24], ID 1993. Today's date is October 2nd, 2023,
> and it's 5:46 PM. All right. Initially, Julian, we spoke earlier briefly, we were
> getting into why you were here, and you had asked for a lawyer. All right. Give me
> a second. You had flagged us down when we went to give you your popcorn that
> you wanted to talk to us that you no longer wanted an attorney present and you
> wanted to speak to us regarding the case. Is that true?
>
> Julian Flores: I would still like [an] attorney present. However, I am willing to
> cooperate. Understand I've never been through any of this, so I don't even know
> what ways to go.
>
> Det. 2: Right. You want to cooperate.
>
> Julian Flores: I would love for an attorney to be here right now because I don't
> know a bunch of shit that maybe the attorney may know, but I am willing to
> cooperate.
>
> Det. 2: Well, if you want an attorney present, then we'll have to stop this. If you
> want to talk to us, it's going to be without [inaudible 00:01:35].
>
> Julian Flores: I do want to talk to you guys.
>
> Det. 2: All right. You understand if you talk to us, it's going to be without an
> attorney present is what I'm trying to tell you. You understand that, right?
>
> Julian Flores: Yes.
>
> Det. 2: You're still willing to talk to me.
>
> Julian Flores: Can you jog my memory of what it is that I signed?
>
> Det. 2: Do you recognize this?
>
> Julian Flores: Yes, I do recognize this. It was from the first-
>
> Det. 2: Right. It's the same thing.
>
> Julian Flores: First reporting.

6

Det. 2: Yeah. It's the same thing, bro. All right? You said that you wanted to talk regarding it. I want to see what you have to say. Okay? We had told you that you were being arrested for an armed robbery, with a firearm, [inaudible 00:02:13] life in prison. We told you that, right? I know you've had some time, you've been in there, you had a change of heart, you want to talk to us without an attorney present. Talk to me, bro. What's going on? Be straight up, bro.

[ECF No. 30-4 at 1].

The detective told Flores "[t]here's no secret why you're here," and that Flores had been arrested because the police had probable cause to believe he had committed the robbery. [ECF No. 30-4 at 2]. He further stated that Flores should be "[b]e honest. I think that's your best bet. Obviously you want to let something out, I don't know exactly what, but just be honest and I think that would be your best bet in this situation. Go ahead." [*Id.*]. Flores thereafter admitted to, among other things, committing the robbery alleged in the instant action.

### D.  **Summary of Testimony**

At the May 14, 2024, hearing, Detective Acay testified to his experience in law enforcement, the conditions in the interview room on the date that Flores was interviewed, and his motivation for asking certain background questions of suspects during interviews. He stated that Flores was not handcuffed during the interviews, which took place in a well-lit, unlocked room.[3] [Hearing Transcript, 13:2–16:1]. Before Detective Acay read Flores his *Miranda* rights, he obtained certain background information from him, including his name, date of birth, and contact information. [*Id.* at 43:3–15]. The *Miranda* rights were read (mostly verbatim) from the *Miranda* Rights Waiver Form during the first interview.[4] According to the detective, the form is sometimes simplified for the benefit of the suspect to better understand their constitutional rights. [*Id.* at 45:24–46:7].

---

[3] *See* rough draft transcript of May 14, 2024, hearing.
[4] The form is attached to Defendant's Motion at ECF No. 30-5.

Detective Aguero also testified to the background questions typically asked pre-*Miranda*, and, most importantly, regarding Flores' re-engagement hours after the first interview concluded. [*Id.* at 51:18–52:11]. Specifically, Detective Aguero and Flores engaged in a brief conversation while Flores was in the holding cell, at which point Detective Aguero informed Flores that, if he wished to talk, it would have to be "on a body cam and we are going to have to go over your rights and you have to state that you no longer want an attorney if that's what you want. Okay? We are not going to be playing games. Do you want to do that? He said, yeah, I want to talk to you." [*Id.* at 59:25–60:4].

## LEGAL STANDARD

*Miranda v. Arizona* established procedural safeguards requiring law enforcement to advise suspects of certain constitutional rights before initiating a custodial interrogation.

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 479.

After law enforcement gives the *Miranda* warning, and after the suspect is given an opportunity to exercise those rights, "the suspect may voluntarily, knowingly, and intelligently waive those rights and make admissible statements to law enforcement agents." *United States v. de Alejo*, 21-20069-CR, 2021 WL 4751271, at *3 (S.D. Fla. Oct. 2, 2021), *report and recommendation adopted*, 21-20069-CR, 2021 WL 4749797 (S.D. Fla. Oct. 12, 2021) (citing

*Miranda*, 384 U.S. at 479). "In the absence of such warnings and waiver, however, evidence obtained as a result of the custodial interrogation will be inadmissible." *Id.*

The evidentiary burden at a suppression hearing is preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974). On his Motions to Suppress, Flores bears the burdens of proof and persuasion. *United States v. Touset,* 890 F.3d 1227, 1231 (11th Cir. 2018) (individual challenging a search bears burdens of proof and persuasion). The Government bears the burden of proving a knowing, voluntary, and intelligent *Miranda* waiver. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986). Whether Flores' statements were voluntary must be examined in light of the totality of the circumstances. *See Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A waiver is effective where the "'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted). A written waiver "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

## **DISCUSSION**

As an initial matter, the Government acknowledges that it does not intend to offer certain statements into evidence at trial, therefore requesting that Flores' Motion to Suppress be denied as moot as to: (1) statements made pre-*Miranda* and (2) statements made during the first interview *after* Flores' invocation of his right to counsel through the rest of the first interview. [ECF No. 32 at 8–9; First reference at ECF No. 30-3 at 14: "So I would like to contact a lawyer or something."].

The defense argues Flores' pre-*Miranda* statements regarding his cellphone number should be suppressed because the detective asked substantive questions related to the crime, and even if

the Government does not intend to use them at trial, the information was used to obtain a search warrant for Flores' cellphone. [5] Both parties agree statements made once Flores invoked his right to counsel should be suppressed. The defense maintains that includes Flores' post-*Miranda* statements during the second interview, however, because even though Flores reinitiated the discussions, he stated he would still like to have an attorney present, and he was misled about his right to have an attorney present during the questioning and about the consequences of relinquishing his right to silence. [ECF No. 30 at 9]. As will be addressed in greater detail below, Defense counsel focused on two statements made by Detective Aguero to Flores during the first and second interview: (1) "Be honest" and (2) that he had "nothing to worry about." [Hearing Transcript, 55:1; ECF Nos. 30-3 at 13; 30-4 at 2].

Each contested and relevant statement is addressed in turn.

### A.  First Interview Pre-*Miranda* Should Not Be Suppressed

Flores argues that, pre-*Miranda*, he "was asked substantive questions related to the detectives' investigation of the crimes alleged in the indictment." [ECF No. 30 at 2]. While the Government takes the position that all pre-*Miranda* statements are moot, the Court must address the reference to Defendant's phone number—used to obtain a search warrant of Flores' same phone. [ECF No. 30-3 at 1].

The parties' arguments at the evidentiary hearing—and the search warrant itself—suggests that the phone number is the only pre-*Miranda* statement that was used to obtain the search warrant. In relevant part, the search warrant states that "Flores confirmed his cell phone number to detectives during his interview. . .." [Evidentiary Hearing, Defendant's Exhibit F].

---

[5] Defendant's counsel stated at the hearing that any relief seeking the exclusion of the *fruits* of any statement made during the two interviews—although referenced in the instant briefing—will be brought in a separate motion. [Hearing Transcript, 79:2–22].

While a suspect's statements made in response to an interrogation before *Miranda* warnings are given are not admissible at trial, there are exceptions. One is the "routine booking exception." Under this exception, "a defendant's answers to questions designed to elicit the information necessary to complete booking may be used against him, even if those answers turn out to be incriminating." *United States v. Brotemarkle*, 449 F. App'x. 893, 896–97 (11th Cir. 2011) (citing *United States v. Doe,* 661 F.3d 550, 567 (11th Cir.2011) (quoting *Pennsylvania v. Muniz,* 496 U.S. 582, 601 (1990)). This exception permits the use of statements made in response to questions "reasonably related to the police's administrative concerns." *Muniz,* 496 U.S. at 601–02. Indeed, "the Eleventh Circuit has consistently included the subjective intent of the officer as a significant factor in determining whether the routine booking question exception applies." *United States v. Doe*, 3:19-CR-188-MMH-JBT, 2021 WL 2432275, at *8 (M.D. Fla. June 15, 2021). *See United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (rejecting defendant's contention that the officer's questions were intended to elicit incriminating information and finding "no evidence was presented that [the officer's] reason for asking [the defendant] his address was other than to secure routine booking information").

Here, Detective Acay testified that he usually begins interviews with background questions to figure out "what kind of person we are dealing with, whether he can communicate with us or not." [Hearing Transcript, 17:21–22]. He confirmed that he typically asks suspects their name, date of birth, and contact information as well as question regarding property recovered at the time of arrest. [*Id.* at 43:3–23]. A review of the interview transcript shows that at the outset, the detective asked Flores what his cellphone number was, asked whether the cellphone in his possession was his, whether he had multiple cellphones, what type of cellphone he had, and whether the cellphone was with him when he was arrested. [ECF 30-3 at 1-2]. He immediately explained to Flores the

purpose of his questions was to correctly document the property the police had taken from Flores at his arrest. [*Id.*]. While the fact that Flores had identified the cellphone as his and it was later used to support a warrant to search it, that alone does not establish that the officer's purpose was to elicit incriminating evidence. Reviewing the evidence as a whole, it is clear from the search warrant that the police already knew Flores' cellphone number because they had used cell site data from the telephone to locate Flores to arrest him. Also, it was Flores who prompted the search of his cellphone by later alleging during his second interview that there were messages on the cellphone from individuals who had allegedly forced him to commit the robbery.

Therefore, Detective Acay's testimony confirming that his pre-*Miranda* question as to Flores' cellphone number was routine is credible and Flores' statement should not be suppressed. Regarding the remaining statements made pre-*Miranda*, the parties have not indicated that they were used as a basis to obtain the search warrant, and, in any case, will not be offered by the Government at trial.

**B.  First Interview Post-*Miranda* and Flores' *Miranda* Rights Warning**

After Defendant's *Miranda* rights were read to him, he signed the *Miranda* Rights Waiver Form. [ECF No. 30-5]. Defendant then engaged in a conversation regarding, among other things, a firearm, a vehicle he rented with his mother, and his girlfriend's name and address. [ECF No. 30-3 at 10–14]. Thereafter, Defendant invoked his right to an attorney when he stated "[s]o I would like to contact a lawyer or something." [*Id.* at 14].

First, the Government does not intend to introduce—at trial—any statements made during the first interview after Flores' first reference to an attorney. [ECF No. 32 at 8–9]. It is well established that any statements made after Flores signed the *Miranda* Rights Waiver Form, but before he requested an attorney, should be admitted.

Second, the case law does not mandate a precise formulation of the *Miranda* warning. *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant."). A court considering this issue "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (citing *Prysock*, 453 U.S. at 361). The Court must make two distinct findings in order to conclude that a defendant's statement was made after a knowing and voluntary waiver of the *Miranda* rights. *Moran*, 475 U.S. at 421. First, the decision to relinquish the rights and make a statement must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the decision must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Here, the warnings were read to Flores verbatim from the *Miranda* Rights Waiver Form, except the right to counsel, which was read as follows: "You got the right to talk to an attorney for advice before we ask you any questions and before questioning. Do you understand that?" [ECF No. 13-3 at 8]. This statement clearly conveyed Defendant's right to an attorney. The Defendant signed the form indicating a waiver of his *Miranda* rights, and, at any rate, he understood those rights, which were read to him and later waived by signature. Defendant never stated that he is unable to read, only that he has a sixth-grade education and is dyslexic. [*Id.* at 3, 7; Hearing Transcript, 35:15–20]. His waiver was a free and deliberate choice made after an understanding of the rights that he was abandoning as well as the consequences that flowed from that waiver. This is evidenced by his agreement to one detective's statement that "nobody [was] forcing [him]" to

speak and the repeated references to his ability to cease questioning at any time. [ECF No. 13-3 at 9].

But the inquiry does not end there. Flores maintains that his statements were not voluntary, knowing, and intelligent, citing one of the detective's statements made after he waived his right to an attorney: "[y]ou can't bring your lawyer here and sit down and have questions." [ECF Nos. 30-3 at 16; 30 at 8]. This statement, Defendant argues, contradicts the previously signed *Miranda* Rights Waiver Form which states "[y]ou have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning." [ECF No. 30-5]. A similar statement was made during the second interview. [ECF No. 30-5 at 1]. Defendant argues that these statements by law enforcement render any previous waivers invalid. [ECF No. 30 at 9].

At the onset, it is important to highlight the fact that this circuit, like many others, "recognize[] the importance of informing suspects that they have the right to have a lawyer present prior to and during interrogation." *Brown v. Crosby*, 249 F. Supp. 2d 1285, 1306 (S.D. Fla. 2003). The Government's supplemental authority sheds light on two Supreme Court cases related to this issue. First, in *Duckworth v. Eagan*, "the Supreme Court couched the *Miranda* advisement regarding the right to have an attorney present during questioning as serving an informational function that descends from the right to counsel." 492 U.S. at 204; [ECF No. 45 at 1]. However, as pointed out by Defendant, the court recognized that "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." [*Id.*]. Second, in *Florida v. Powell*, 559 U.S. 50, 60 (2010), "the Supreme Court recounted its historical rejection of any talismanic incantations that are required in . . . *Miranda* advisements, so long as, taken together, the advisements reasonably convey the import of the

*Miranda* advisements." ECF No. 45 at 2]. There, officers communicated to the suspect that he could consult a lawyer before answering questions and that he could exercise that right while the interrogation was underway. "In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times." [*Id.*]. Defendant, in turn, emphasized that *Duckworth* and *Powell* noted that the suspect must be informed that he has the right to have a lawyer with him *during* questioning. [ECF No. 46 at 2]. Flores maintains that the officers' statement that he could not bring his lawyer there while he was questioned was incorrect and misleading.

Here, the Court reiterates its prior point: law enforcement was not required to read, *verbatim*, the rights listed in the form. And while the detective's oral statement and the written statement signed by Defendant are somewhat inconsistent, Defendant signed the waiver form and made no indication that he could not read the rights listed there. *See United States v. Contreras,* 667 F.2d 976, 979 (11th Cir. 1982) (stating that a *Miranda* warning is adequate when a suspect is advised of "right to consult with an attorney prior to questioning, to have an attorney present during questioning, and to have counsel appointed" but that "[a] Miranda warning need not explicitly convey to the accused his right to appointed counsel '*here and now*'. . .") (emphasis added).

Furthermore, the record confirms the statement was not incorrect in that Detective Aguero confirmed that there are no lawyers on-call to represent suspects being questioned at the police station. [Hearing Transcript, 64:2–9]. So, while an attorney *may* be present for questioning, it is unlikely that one would have been available before he was sent to a correctional center. Thus, even though Flores had a right to counsel and was repeatedly so advised that he would be able to contact an attorney once his arrest paperwork was processed and he was transferred to the jail, he was

informed that, as a practical matter, there were no attorneys presently at the police station to represent him during his interview.

Hart v. Attorney Gen. of State of Florida, 323 F.3d 884 (11th Cir. 2003) and U.S. v. Beale, 921 F.2d 1412 (11th Cir. 1991), two Eleventh Circuit cases relied on by Defendant in support of Flores' voluntariness argument, dealt with situations where law enforcement directly contradicted the Miranda warnings. As will be discussed in greater details below, the court in those cases held that the detectives' statements were considered either misleading or deceptive. Here, Detective Aguero's statement, while inconsistent with the text of the Miranda Rights Waiver Form, were not "misleading" to Flores, who clearly understood the rights that were read to him and later signed away by him. Indeed, Flores did not ask any clarifying questions to the statement "[y]ou can't bring your lawyer here." In fact, agreed with it: "No, obviously not. . .." [ECF No. 30-3 at 16].

The claim that the Miranda warning must explicitly state that the defendant has a right to have an attorney during custodial interrogation was addressed in a habeas corpus proceeding in this district court and rejected. See Jackson v. McNeil, No. 09-60033-CIV, 2010 WL 732015 (S. D. Fla. Feb. 26, 2010). The defendant was told that he "had the right to talk with a lawyer present before any questioning and that if he could not afford a lawyer, one would be appointed to represent him before any questioning if he wished." Id. at *9. The defendant then signed a waiver form stating he was willing to speak with the officers without an attorney present "at this time." Id. Jackson relied upon Supreme Court decisions like California v. Prysock and Duckworth v. Eagan, which rejected precise formulaic warnings so long as the warning adequately fulfilled Miranda's requirements that the defendant understand his right to consult with a lawyer during questioning and that his statements could be used against him at trial. Id. Here, Flores' written Miranda

warning clearly stated he had a right to have the attorney present during questioning and he was repeatedly told that no attorney was present.

Next, Defendant challenges Detective Aguero's pre-*Miranda* statement that Flores had "nothing to worry about." [Hearing Transcript, 55:1; ECF No. 30-3 at 13]. Similarly, Detective Acay stated that Flores "should have nothing to worry about." [ECF No. 30-3 at 13]. Defendant relies on *Hart v. Attorney Gen. of State of Florida*, in which the circuit court reversed the district court's denial of defendant Hart's habeas corpus petition because, upon an examination of the totality of the circumstances, the defendant's waiver of his *Miranda* rights was a "product of deception." 323 F.3d at 893. First, during Hart's interview, he asked to speak to a specific detective (one known to Hart for her work with juveniles and gangs in Hart's neighborhood). Hart asked the detective for advice, specifically, whether he should get an attorney. [*Id.* at 888]. The detective responded that she could not answer that question and that Hart had to make his own decision. [*Id.*]. Second, Hart asked the detective what the pros and cons were of having an attorney, in her opinion. [*Id.*]. The detective responded that an attorney would tell Hart to "protect [his] rights. He'll tell [him] what to answer, what not to answer, and he'll be here for [him]." [*Id.*]. Although the court acknowledged that this was an acceptable response, the following response was not: "I'm going to want to ask you questions and he's going to tell you you can't answer me." [*Id.* at 894]. The court explained that "[t]he reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination, yet, [the detective] in effect told Hart that this was the *disadvantage* of having a lawyer. [*Id.*] (emphasis added). Finally, the detective stated that "honesty wouldn't hurt him." [*Id.*]. The court held that this statement "contradicted the *Miranda* warning that anything he said could be used against him in court." [*Id.*].

Similarly, in *U.S. v. Beale*, the circuit court held that, by telling the defendant that signing the *Miranda* waiver form would not hurt him, the agents contradicted the *Miranda* warning "that defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." 921 F.2d at 1435.

While *Hart* and *Beale* are instructive, given the totality of the circumstances in this case, the undersigned cannot conclude that the detective's statements that Flores had or should have "nothing to worry about" affected his decision to waive his rights or were misleading or deceptive. In *Hart*, the defendant trusted the detective based on previous experiences and the decision to waive his right was based on the three apparently deceptive and contradictory statements. *Hart*, 323 F.3d at 895. That is not the case here. Unlike the defendant in *Hart*, Flores did not hold the detectives in a position of trust and in fact told them so. And unlike the facts in *Beale*, this statement was not made *before* the suspect signed the form. It was made later in the interview. In any case, the record is devoid of any confusion by Defendant.

At the hearing, Detective Aguero testified that his statement "[y]ou have nothing to worry about" was regarding "his safety, there's nothing to worry about in that sense, that he is in a secure location, he is with officers, there's nothing to worry about." [Hearing Transcript, 55:6–13]. There is no indication that Flores believed the statement to be a promise of immunity. "Q: When you said you have nothing to worry about, was that any kind of promise to him? A: No, not at all. Q: Was that a promise of immunity for what he was going to say? A: That's not what I said, no. Q: Based on how Mr. Flores responded to you, did he indicate that he thought it was a promise of immunity or that his statements would not, in fact, be used against him? A: No." [Hearing Transcript, 56:4–12]. Nothing on the record suggests that the Defendant believed that somehow his statements would not be used against him. *See Agee v. White*, 809 F.2d 1487, 1494 (11th Cir.

18

1987) (rejecting appellant's argument that his *Miranda* waiver was not "voluntary" after an officer indicated that appellant may be needed to serve as a witness and that he had "nothing to worry about[,]" holding that the confession was not rendered involuntarily and cannot be construed as an implied promise of immunity); *United States v. Frank*, 04-20778-CR, 2007 WL 9706275, at *7 (S.D. Fla. Mar. 16, 2007), *aff'd*, 599 F.3d 1221 (11th Cir. 2010) (holding that defendant's statements to authorities were voluntary despite being told: "don't worry; just give us truthful answers.").

Most importantly, Flores knew he could invoke his right to counsel and clearly did so. Approximately 20 minutes into the first interview, Flores stated that he "would like to contact a lawyer or something." [ECF No. 30-3 at 14]. This signals a clear invocation of Defendant's right to counsel. Indeed, "[t]his is a 'rigid rule that an accused's request for an attorney is *per se* an invocation of his fifth amendment rights, requiring that all interrogation cease.'" *United States v. Herrera,* 711 F.2d 1546, 1557 (11th Cir.1983) (quoting *Fare v. Michael C.,* 442 U.S. 707, 719 (1979)). These post-*Miranda* statements are inadmissible in the Government's case-in-chief. *See United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) (holding statement inadmissible where agent asked suspect if he would like the federal criminal justice process explained after suspect invoked right to counsel).

### C.  Flores' Second Interview Statements Should Not Be Suppressed

At the conclusion of the first interview, Flores was placed in a holding cell for approximately four hours while detectives completed paperwork. [ECF No. 30-4 at 1; Hearing Transcript, 60:10–11]. Flores then flagged down Detective Aguero asking to reinitiate the discussion with detectives. Flores stated: "I would still like an attorney present. However, I am willing to cooperate." [ECF No. 30-4 at 1]. Detective Aguero responded: "Right. You want to

cooperate." [*Id.*]. Flores reiterated that he "would love for an attorney to be here right now . . . but I am willing to cooperate." [*Id.*]. The detective then stated that, "if you want an attorney present, then we'll have to stop this. If you want to talk to us, it's going to be without [an attorney]." [*Id.*]. "I do want to talk to you guys[,]" responded Flores. [*Id.*]. A detective again clarified that "if you talk to us, it's going to be without an attorney present is what I'm trying to tell you. You understand that, right?" Flores responded: "Yes." [*Id.*].

After an accused invokes his right to counsel or right to remain silent, custodial interrogation must cease, and "*[o]nly* if the accused . . . voluntarily initiates further communications can the agents pursue more information and interrogation." *United States v. Gomez*, 927 F.2d 1530, 1537 (11th Cir. 1991) (emphasis in original).  Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (citing *McNeil v. Wisconsin,* 501 U.S. 171, 178, (1991)). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." [*Id.*].

Upon the Court's consideration of the totality of the circumstances in this case, the undersigned recommends admitting all statements made during the second interview. Flores reinitiated the conversation with detectives. He was brought back to the interview room at his request, after having had time to reflect, indicating a "free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. Defendant does not dispute that his "level of comprehension" remained unchanged. [*Id.*]. In addition, *four* statements were made by detectives in an effort to confirm Flores' desire to speak to them without an attorney present. [ECF

No. 30-5 at 1]. The undersigned disagrees with defense counsel that the statement shows that Flores clearly wanted an attorney present. He stated *both* that he would like an attorney present *and* that he was willing to speak to detectives. Flores did not unequivocally invoke his right to counsel. This is precisely the ambiguity contemplated in *Davis*, which did not require a cessation of question. Flores repeatedly confirmed his willingness to speak without an attorney: Detective: "All right. You understand if you talk to us, it's going to be without an attorney present is what I'm trying to tell you. You understand that, right?" Flores' response: "Yes." [ECF No. 30-4 at 1].

In *U.S. v. Ochoa*, defendant Ochoa stated he did not "really agree with" the waiver of rights form he had been given. 941 F.3d 1074, 1099 (11th Cir. 2019). The court determined that this statement was not an unambiguous and unequivocal invocation of his right to counsel or his right to remain silent. [*Id.*]. The court further explained that there were several possible interpretations to Ochoa's statement, including that Ochoa did not wish to answer questions without a lawyer. [*Id.*]. Thus, follow up clarifying questions were appropriate. Here, as in *Ochoa*, follow up questions regarding Flores' decision to speak with or without a lawyer were entirely appropriate and led to a definite "yes" from the Defendant in response to whether he would like to speak to detectives without an attorney. [ECF No. 30-4 at 1].

Next, the Court addresses Detective Aguero's recommendation to Flores that he "[b]e honest. I think that's your best bet. Obviously you want to let something out, I don't know exactly what, but just be honest and I think that would be your best bet in this situation. Go ahead." [*Id.* at 67:17; ECF No. 30-4 at 2]. The parties rely on a string of cases, most decided by the Eleventh Circuit. Nevertheless, the undersigned concludes the statement did not amount to a promise of immunity and thus did not make Flores' statements involuntary or coercive.

First, Defendant relies on *Hart*, already discussed in this report, where the suspect was told that "honesty wouldn't hurt him." 323 F.3d at 889. In turn, the Government relies on *United States v. Hipp*, where the defendant was interviewed in his home by an FBI agent, and the court held that the agent's statement that cooperating truthfully would be in his "'best interest' were not sufficiently coercive to render [the defendant's] statements involuntary." 644 F. App'x 943, 947 (11th Cir. 2016). *Hipp* cites to two more cases directly on point. *See United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983), *holding modified by United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998) (holding that "a mere admonition to the accused to tell the truth does not render a confession involuntary" after appellant told an agent that he wanted to help himself and the agent responded that "he could help himself out by telling [the agent] whether there was any ludes available and who brought the ludes in . . .."); *United States v. Nash,* 910 F.2d 749, 753 (11th Cir.1990) (holding that an agent's statement to the defendant that cooperating defendants generally "fared better time-wise" did not amount to an illegal inducement). The most recent case cited by the Government is *U.S.   v. Cosimano*, where the court upheld a district court's denial of a suppression motion for statements made during a custodial interrogation. 19-14841, 2022 WL 3642170, at *8 (11th Cir. Aug. 24, 2022), *cert. denied sub nom. Mencher v. United States*, 143 S. Ct. 612 (2023), and *cert. denied*, 143 S. Ct. 824 (2023).  There, an agent's statement that honesty could "help" him and put him "in the best possible position" did not equate to a promise and the defendant was well-aware that he was signing a waiver form. [*Id.*].

Unlike in *Hart*—where the detective told the defendant that "honesty wouldn't hurt him"—detectives here made a vastly different statement: "[b]e honest. I think that's your best bet." Whereas the former statement is misleading, as further analyzed in *U.S. v. Farley*, "because it simply [is] not true—honesty can doom a guilty man[,]" the latter statement is not. 607 F.3d 1294,

1329 (11th Cir. 2010). In other words, a suggestion to "[b]e honest" does not equate to, essentially, a promise, that "honesty wouldn't hurt him." It certainly did not contradict the *Miranda* warning that anything he said could be used against him in court. Further, Defendant's attempt to distinguish *Hipp*, *Vera*, and *Nash* because neither involved a defendant who had already invoked his right to counsel, is a distinction without a difference. Defendant leaves out the fact that Flores re-initiated conversations with the detectives, repeatedly agreed to speak to detectives without an attorney, and was presented a copy of the *Miranda* Rights Waiver Form that he had previously signed.

<u>**CONCLUSION**</u>

For the foregoing reasons it is **RECOMMENDED** that Defendant Julian Flores' Motion to Suppress Statements [ECF No. 30] be **DENIED** as follows:

The statements made before Flores' *Miranda* rights were read to him in response to background questions should not be suppressed. Once he invoked his *Miranda* rights during the first interview, any statements he made thereafter must be suppressed. Finally, all statements made during the second interview, where he reinitiated the interview with the detectives and repeatedly—voluntarily and knowingly—waived his right to have an attorney present, should not be suppressed.

Objections to this Report may be filed with the district judge within **seven (7)** days of receipt of a copy of the Report. A response may be filed **seven (7)** days after the filing of the objections. The Court has shortened the usual 14-day objection period based on the trial date. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also*

*Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28

U.S.C. § 636(b)(1)(C).

      **SIGNED** this 30th day of May, 2024.


_____

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE


cc:    **United States District Judge Melissa Damian;**

       **All Counsel of Record**